UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BRENDA E. SIRACUSE,

    Plaintiff,

v.                                                 CASE NO. 6:16-cv-1340-Orl-MCR

ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

    Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her applications for a Period of Disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"). Plaintiff alleges she became disabled on January 1, 2011. (Tr. 216, 227.) A video hearing was held before the assigned Administrative Law Judge ("ALJ") on October 16, 2014, at which Plaintiff was represented by an attorney. (Tr. 36-54.) The ALJ found Plaintiff not disabled from January 1, 2011 through November 6, 2014, the date of the decision.[2] (Tr. 16-30.)

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Docs. 13 & 16.)

[2] Plaintiff had to establish disability on or before March 31, 2014, her date last insured, in order to be entitled to a period of disability and DIB. (Tr. 19.)

1

In reaching the decision, the ALJ found that Plaintiff had the following severe impairments: an ankle disorder, an affective disorder, an anxiety disorder, and borderline intellectual functioning. (Tr. 21.) The ALJ then found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21-22.) Specifically, the ALJ found that the requirements of Listing 12.05(C), intellectual disability, were not met because, despite Plaintiff's full scale intelligence quotient ("IQ") scores of 65 and 61, there was evidence of adaptive functioning in that Plaintiff had worked as an assistant manager for over nine years and had been assessed at the borderline intellectual functioning level. (Tr. 23.) Then, after finding that Plaintiff had the residual functional capacity ("RFC") to perform light work with limitations,[3] the ALJ ultimately found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 23, 28.)

Plaintiff is appealing the Commissioner's decision that she was not disabled from January 1, 2011 through November 6, 2014. Plaintiff has exhausted her available administrative remedies and the case is properly before the Court. The Court has reviewed the record, the briefs, and the applicable law.

---

[3] As part of his RFC, the ALJ found, *inter alia*, that Plaintiff "must perform simple tasks in a low stress work environment with no production line and simple repetitive tasks," and "must avoid contact with the public." (Tr. 24.)

2

For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

   I.   **Standard of Review**

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356,1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II. Relevant Evidence of Record

### A. Examining Sources

#### 1. Elek J. Ludvigh, Ph.D.

On May 16, 2012, Dr. Ludvigh conducted a psychological examination of Plaintiff. (Tr. 317-21.) He administered four tests: the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), the Adaptive Behavior Assessment System-Second Edition (ABAS-II), the Incomplete Sentences Form (Verbal Administration), and the LV Type Indicator (Verbal Administration). (Tr. 317.) Dr. Ludvigh observed:

> [Plaintiff] was noticeably underweight, arrived for the interview poorly dressed and groomed, but made a good overall personal impression, given her intellectual limitations and emotional distress. She was alert, pleasant, open, and cooperative, but also exhibited frequent nervous laughter, and periodic tearfulness.

(Tr. 318.)

Under Relevant Developmental Background, Dr. Ludvigh stated in part:

Brenda reports that she was in Special Education classes in school due to being "a slow learner." She withdrew from school after completing the tenth grade, and was told she needed to either return to school or get a job. Brenda began working, and reports that she has primarily worked in fast food restaurants. She was employed by Hardee's for over nine years as a cashier and line supervisor, and states that she "loved that job." Brenda last worked for Checkers, and states she was with that employer for over one year. She quit because "The kids were telling me what to do and how to do it, and the manager didn't care."

> Brenda reports that she is currently unable to work because she does not have a valid ID. Her Florida ID card has expired and she needs a copy of her birth certificate in order to obtain a new ID. Brenda is currently homeless, cannot financially afford to obtain a copy of her birth certificate, and also lacks a home address.

(*Id.*)

> In his Personality Assessment, Dr. Ludvigh opined:
>
> Brenda does the best she knows how to do, and has a surprisingly good work history, given her limited ability to quickly acquire and retain job skills. She very much wants to obtain and maintain stable employment, but is currently overwhelmed by the difficulties associated with being homeless, not having a valid ID, having lost her social security card, and lacking the computer and literacy skills to adequately complete on-line job applications. It is expected that Brenda will be a good employee if her living situation can be stabilized and if she can be assisted in obtaining employment.

(Tr. 320.)

Plaintiff's full scale IQ score was 65, showing that she was "functioning within the [m]ildly [m]entally [r]etarded range of intellectual ability (approximately 1% of the population scores below this point)." (*Id.*) On the ABAS-II, Plaintiff "obtained a Generalized Adaptive Composite score of 69. Her highest scores were in the areas of Home Living and Communication, while her lowest scores were in the areas of Functional Academics and Community Use." (*Id.*) Dr. Ludvigh noted that the test "results appear[ed] to be a valid reflection of Brenda's ability to perform standard intellectual tasks since rapport and motivation were

good and no situational variables were observed which could have significantly affected her performance." (*Id.*)

Dr. Ludvigh diagnosed Plaintiff with mild mental retardation and major depression, single episode, moderate. (*Id.*) He stated that Plaintiff's major limitation affecting employment would be her mild mental retardation. (Tr. 321.) He explained:

> It will be much more difficult for [Plaintiff] to learn new job-related skills than for the average person, she will need more time to repeatedly perform tasks under close supervision before she can be said to have learned a task. Skills, no matter how well they were learned at one time, which are not used on a regular and repetitious basis will tend to be forgotten completely or in part. Brenda needs to work in an environment where her daily tasks are routine and largely unchanging.

(*Id.*) Dr. Ludvigh noted that Plaintiff was also "seriously limited by her depression," and he "highly recommended" psychotherapy to help her deal with her depression "due to the extent to which her depressive behaviors impair[ed] her ability to obtain employment or further benefit from the rehabilitation process." (*Id.*) He concluded that Plaintiff "appear[ed] to be an appropriate candidate for basic competitive employment, but [would] need the assistance of a Job Coach during job search and initial job training activities. (*Id.*)

## 2. J. Jeff Oatley, Ph.D., FICPP[4]

On July 22, 2013, Dr. Oatley conducted a psychological evaluation of Plaintiff and completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("MSS"). (Tr. 357-64.) Plaintiff's mental status examination revealed a limited fund of knowledge, and her memory and concentration were consistent with lower intellectual functioning.[5] (Tr. 358-59.) Plaintiff's full scale IQ score was 61. (Tr. 359.) Dr. Oatley diagnosed mild mental retardation "as indicated by an individually administered intelligence test and adaptive behavior." (*Id.*)

In his MSS, Dr. Oatley opined that Plaintiff was moderately limited in the ability to carry out complex instructions and to make judgments on complex work-related decisions due to her mild mental retardation. (Tr. 362.) Plaintiff had mild limitations in several areas, including the ability to understand and remember complex instructions, to interact appropriately with co-workers and supervisors, and to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 362-63.) Dr. Oatley found Plaintiff unable to manage benefits in her own best interest. (Tr. 364.)

---

[4] Dr. Oatley holds a Doctorate in Clinical Psychology and is a Board Certified, Diplomate-Fellow in Psychopharmacology by the International College of Prescribing Psychologists. (Tr. 357.)

[5] Dr. Oatley noted, *inter alia*, that Plaintiff "could name the current and [two] recent U.S. Presidents, reported there were 24 months in a year, and did not know for what Martin Luther King, Jr. was famous." (Tr. 358.)

### B. Non-Examining Sources

### 1. Mercedes DeCubas, Ph.D.

On October 31, 2012, following a review of the available records, Dr. DeCubas diagnosed Plaintiff with borderline intellectual functioning and affective disorders. (Tr. 57.) She opined that Plaintiff was moderately limited in the following categories: the ability to understand, remember, and carry out detailed instructions; the ability to sustain an ordinary routine without special supervision; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independently of others. (Tr. 59-61.) Dr. DeCubas explained:

> Claimant is able to carry out simple instructions. She can follow a schedule and can sustain goal-directed activity in a setting that does not require timed work. Initial assistance may be helpful to ensure understanding. . . . Claimant needs a setting with few changes/demands in order to avoid confusion. She would benefit from assistance in developing realistic plans.

(Tr. 60.)

### 2. Sheldon Levy, Ph.D.

On January 4, 2013, Dr. Levy, a State agency, non-examining psychologist, assessed Plaintiff with borderline intellectual functioning and

affective disorders. (Tr. 77.) He opined that Plaintiff was moderately limited in the following categories: the ability to understand, remember, and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. (Tr. 80-81.) Dr. Levy noted that Plaintiff's "overall mental status and [activities of daily living] suggest[ed] that she [was] capable of simple[,] repetitive tasks in the work environment." (Tr. 81.)

### III. Discussion

The ALJ found that Plaintiff did not meet the requirements of Listing 12.05(C) for intellectual disability because, despite her full scale IQ scores of 65 and 61, there was evidence of adaptive functioning in that Plaintiff had worked as an assistant manager for over nine years and had been assessed at the borderline intellectual functioning level. (Tr. 23.) Plaintiff argues that the ALJ's reasons for finding evidence of adaptive functioning are not valid, and, as such, the ALJ's conclusion that Plaintiff did not meet the requirements of Listing

9

12.05(C) is not supported by substantial evidence. The Court agrees with Plaintiff.

Listing 12.05 provides in relevant part:

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning[6] initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . .
C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Thus, for an impairment to meet the requirements of Listing 12.05(C), there must be deficits in adaptive functioning initially manifested prior to age 22, as well as both an IQ score in the range of 60 to 70 and a physical or other mental impairment. *Id.*

In 2001, the Eleventh Circuit held that "there is a presumption that mental retardation is a condition that remains constant throughout life." *Hodges v. Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001). Because of this presumption, a plaintiff who demonstrates valid IQ scores after the age of 22 in the range

---

[6] "Adaptive functioning" refers to an "individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." POMS DI 24515.056(D)(2). The Diagnostic and Statistical Manual of Mental Disorders ("DSM") states that adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociological background, and community setting." DSM-IV-TR at 42.

provided for in Listing 12.05 does not need to show evidence that deficits in adaptive functioning manifested before age 22. *Id.* Instead, valid low IQ scores after the age of 22 create a presumption that the plaintiff had deficits in adaptive functioning manifested prior to age 22. *Id.* at 1269.

Even if a plaintiff demonstrates low IQ scores, however, the Commissioner may rebut the presumption of mental impairment before age 22 by presenting evidence of Plaintiff's daily life. *Id.* "[A] valid [IQ] score need not be conclusive of mental retardation where the [IQ] score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery*, 979 F.2d at 837. As the Eleventh Circuit explained in *Popp v. Heckler*:

> [The intellectual disability listing] does not require the Secretary to make a finding of [intellectual disability] based on the results of an IQ test alone. *See Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir.1984) ("The plaintiff has failed to supply this court, nor have we found any case law requiring the Secretary to make a finding of [intellectual disability] based *solely* upon the results of a standardized intelligence test in its determination of mental retardation"). The listing requires the Secretary to take into account the intelligence test *and* the medical report. Moreover, the test results must be examined to assure consistency with daily activities and behavior. Thus, in the instant case, it was proper for the ALJ to examine the other evidence in the record in determining whether Popp was in fact [intellectually disabled].

779 F.2d 1497, 1499 (11th Cir. 1986) (per curiam) (emphasis in original). As the *Popp* court recognized, the Listing itself provides that an IQ score is not necessarily determinative of intellectual disability. *See* 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 12.00(D)(6)(a) ("The results of standardized intelligence tests may provide data that help verify the presence of intellectual disability or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.").

Here, as evidence of Plaintiff's adaptive functioning, the ALJ pointed out that Plaintiff "has been assessed at the borderline intellectual functioning level" and that she worked "as an assistant manager for over [nine] years." (Tr. 23.) However, these reasons are not supported by substantial evidence in the record.

First, although Plaintiff has been diagnosed with borderline intellectual functioning by two State agency, non-examining consultants (Dr. DeCubas and Dr. Levy), she has also been assessed with mild mental retardation by two State agency, examining physicians (Dr. Ludvigh and Dr. Oatley). Following a consultative examination on May 16, 2012, Dr. Ludvigh diagnosed Plaintiff with mild mental retardation, which, in his opinion, would be a major limitation affecting Plaintiff's employment. (Tr. 320-21.) This diagnosis was based, in relevant part, on Plaintiff's full scale IQ score of 65 and Generalized Adaptive Composite score of 69 on the ABAS-II, which "appear[ed] to be a valid reflection of [Plaintiff's] ability to perform standard intellectual tasks since rapport and motivation were

12

good and no situational variables were observed which could have significantly affected her performance." (Tr. 320.)

The ALJ acknowledged Dr. Ludvigh's assessment, but gave it "partial weight" because other evidence established "an intellectual finding of at least the borderline intellectual level." (Tr. 25; *see also* Tr. 27 (stating that Dr. Ludvigh's "diagnosis of mild mental retardation is contrary to the balance of the record").) The ALJ also acknowledged Dr. Oatley's diagnosis of mild mental retardation, but, in light of the doctor's opinion that Plaintiff "had no limitations in performing simple tasks, mild to moderate limitations in performing complex tasks, and mild limitations in social functioning and adaptation," the ALJ interpreted Dr. Oatley's assessment as consistent with borderline intellectual functioning.[7] (Tr. 26.) Apart from the assessments by Dr. DeCubas and Dr. Levy, there is no other opinion

---

[7] By stating that Dr. Oatley's diagnosis of mild mental retardation equated to borderline intellectual functioning, the ALJ appears to have substituted his own judgment for that of the psychological examiner. *See Carlisle v. Barnhart*, 392 F. Supp. 2d 1287, 1294-95 (N.D. Ala. 2005) ("An ALJ is not allowed to make medical findings or indulge in unfounded hunches about the claimant's medical condition. . . . An ALJ may, of course, engage in whatever idle speculations regarding the legitimacy of the claims that come before him in his *private or personal capacity*; however, as a hearing officer *he may not arbitrarily substitute his own hunch or intuition for the diagnosis of a medical professional*. . . . Rather than accepting Dr. Floyd's [physical capacities evaluation], the ALJ 'succumbed to the temptation to play doctor and make his own independent medical findings.'") (emphasis in original; internal citations omitted). Dr. Oatley's diagnosis was "indicated by an individually administered intelligence test [which showed a full scale IQ score of 61] and adaptive behavior." (Tr. 359.) Dr. Oatley noted that Plaintiff's limited fund of knowledge, memory, and concentration were consistent with lower intellectual functioning. (Tr. 358-59.) He also noted that Plaintiff was unable to manage benefits in her own best interest. (Tr. 364.)

13

evidence in the record indicating that Plaintiff was functioning at the borderline intellectual level.

In essence, the ALJ discounted Plaintiff's diagnosis of mild mental retardation by two examining physicians and, instead, adopted a diagnosis of borderline intellectual functioning as noted in the assessments of two non-examining consultants.[8]  This was improper.  *See Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 986 (11th Cir. Oct 28, 2013) (per curiam) (citing *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985)) ("The opinions of nonexamining physicians are entitled to little weight when they are contrary to those of an examining physician, and, taken alone, they do not constitute substantial evidence.").  Furthermore, the two non-examining consultants rendered their opinions several months prior to the date of Dr. Oatley's examination.  As such, the non-examining consultants, Dr. DeCubas and Dr. Levy, could not have considered Dr. Oatley's opinions, whether singly or in combination with Dr. Ludvigh's opinions and the rest of the record, when they rendered their opinions.

In addition, the ALJ's other reason cited as evidence of adaptive functioning, namely, that Plaintiff had worked as an assistant manager for over

---

[8] A diagnosis of borderline intellectual functioning "is mutually exclusive of mental retardation."  *Jordan v. Comm'r of Soc. Sec. Admin.*, 470 F. App'x 766, 768-69 (11th Cir. Apr. 20, 2012) (per curiam) (citing DSM-IV-TR at 47-48).

14

nine years, is not supported by substantial evidence. The record does not reflect that Plaintiff worked an assistant manager at any of the jobs that she held. (*See* Tr. 42 (stating that Plaintiff worked in a fast food restaurant for nine and a half years as a cashier and a "supervisor,"[9] without indicating how long she held either position); Tr. 43 (stating that in her last job, which lasted about a year, Plaintiff was a cashier).

Defendant concedes that Plaintiff did not work as an assistant manager, but argues that the ALJ's misstatement of fact about Plaintiff's job title was a harmless error. Defendant speculates that the ALJ focused on the fact that Plaintiff had worked for nine and a half years at her job. While this may be true, the Court cannot speculate and "supply a reasoned basis for [the ALJ's decision] that the [ALJ himself] has not given." *Dixon v. Astrue*, 312 F. App'x 226, 229 (11th Cir. Feb. 13, 2009) (per curiam). Rather, the Court must judge the propriety of the ALJ's decision based "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Here, the two reasons cited by the ALJ as evidence of adaptive functioning are not supported by substantial

---

[9] The Vocational Expert classified this job as a management trainee. (Tr. 51.) In a work history report, Plaintiff explained that she was a lead worker, she supervised others and was in charge of ten employees, but did not do any writing, complete any reports, or perform similar duties, and did not hire and fire employees. (Tr. 258.)

evidence.[10] Therefore, the Commissioner's decision is due to be reversed and remanded for further administrative proceedings.

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** with instructions to the ALJ to: (a) reconsider whether Plaintiff's impairment(s) meet or equal the requirements of Listing 12.05(C) in light of the opinions of Drs. Ludvigh, Oatley, DeCubas, and Levy, and the rest of the record; (b) if necessary, to obtain a new mental RFC assessment based on all evidence in the record; (c) if necessary, reconsider the RFC assessment; and (d) conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment consistent with this Order, terminate any pending motions, and close the file.

3. Plaintiff's counsel is advised that, in the event benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in Case No.: 6:12-124-Orl-22 (*In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) &1383(d)(2)*). This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

---

[10] Defendant also invites the Court to affirm the ALJ's decision based on his implicit consideration of Plaintiff's daily activities in finding that Plaintiff did not have deficits in adaptive functioning. The Court declines to do so, given that the ALJ's explicit reasons for finding that Plaintiff did not have deficits in adaptive functioning were not supported by substantial evidence.

**DONE AND ORDERED** at Jacksonville, Florida, on June 20, 2017.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record